Paul A. SKVORC, II, Appellant,

v.

STATE of Alaska, PERSONNEL
BOARD, Appellee.

No. S–8398.

Supreme Court of Alaska.

March 3, 2000.

Rehearing Denied April 24 and 28, 2000.

Jeffrey A. Friedman, Anchorage, for Appellant.

Stephen C. Slotnick, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before MATTHEWS, Chief Justice, COMPTON, EASTAUGH, FABE, and BRYNER, Justices.

## OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

An amended accusation issued by the Alaska Department of Law charged Paul Skvorc, an employee of the Alaska Department of Fish and Game (ADF&G), with twenty-three violations of the Alaska Executive Branch Ethics Act.[1] The Alaska Personnel Board found twenty-two violations, imposed a $10,000 fine, and recommended terminating Skvorc's employment. The superior court affirmed. The amended accusation did not charge Skvorc with twenty specific acts found by the board to be violations of the prohibition on misuse of state time and equipment. We therefore remand for determination of whether lack of notice prejudiced Skvorc, and if so, for dismissal or retrial of those charges. We otherwise affirm, because we find either no merit or no prejudice in Skvorc's other claims of error.

## II. FACTS AND PROCEEDINGS

Paul Skvorc was an ADF&G employee specializing in the use of sonar to count fish. While so employed, Skvorc became involved in several personal business enterprises entailing the use of sonar, and engaged in four activities relevant to this appeal.

While he was an ADF&G employee, Skvorc formed a private business, Acoustic Research and Technology (ART). Skvorc applied on ART's behalf for a grant from the Alaska Science & Technology Foundation. He hoped to develop "a fisheries management tool using pattern recognition for ID of individual fish...." He did not disclose these activities to his supervisors.

As an ADF&G employee, Skvorc also reviewed a letter sent to ADF&G discussing

---

1. AS 39.52.010 et seq.

the use of broadband sonar to identify fish. Its author, Patrick Simpson, sought to interest the state in his ideas for improving fish recognition technology in the hope that the state would hire him or fund his work. Skvorc told Simpson the state would not hire him or fund his work. Skvorc told Simpson that ADF&G was not a funding source. Skvorc and Simpson then met privately and formed Scientific Fisheries Systems, Inc. (SFS) in order to seek federal and state grants to develop new fish identification technology.

SFS applied for a grant from the Alaska Science & Technology Foundation. Although the grant application contained statements suggesting that ADF&G supported the project, Skvorc asked the Foundation not to share the application with ADF&G partly because he feared reprisal.

In early 1993 the Canadian Division of Fisheries and Oceans (DFO) in British Columbia contacted Skvorc at ADF&G. DFO asked Skvorc to look at potential sonar sites on the Fraser River and to offer his advice about sonar placement. Skvorc flew twice to British Columbia for this purpose. On both occasions, the Canadian government paid Skvorc's travel expenses and provided a $100 (Canadian) honorarium.

Skvorc subsequently signed a contract with DFO to provide consulting services on the Fraser River. Skvorc signed the contract at ADF&G and had a subordinate at ADF&G witness his signature. Skvorc did not disclose these activities to ADF&G.

Finally, DFO contacted Skvorc at ADF&G and asked him to conduct a seminar on hydroacoustics in Winnipeg. Skvorc traveled to Winnipeg at Canadian government expense and learned of a project on the Arctic Red River. Skvorc bid on the project on behalf of ART. DFO awarded Skvorc the contract and paid him approximately $7,500 (Canadian).

After Skvorc's supervisors lodged an ethics complaint with the Alaska Department of Law reporting some potential violations, the Alaska Department of Law, Office of the Attorney General, sent Skvorc a letter informing him that it had received an Ethics Act complaint against him. The letter discussed his alleged activities concerning ART and SFS. Apparently paraphrasing the complaint from Skvorc's department, the letter stated that Skvorc may have violated the Ethics Act by misusing his official position, soliciting compensation for the performance of official duties from an entity other than the state, using state facilities to benefit personal and financial interests, and engaging in incompatible outside employment. The letter informed him that the attorney general had accepted the ethics complaint "as a complaint for purposes of initiating an investigation." After investigating, the Department of Law filed a twenty-count accusation against Skvorc with the Alaska Personnel Board in April 1995. An amended accusation filed in July 1995 included three more counts.

The personnel board hearing officer heard the case in November 1995 and issued proposed findings of fact, conclusions of law, and recommendations. The hearing officer found twenty-three violations of the Ethics Act; he recommended assessing fines exceeding $66,-000 and terminating Skvorc's employment. The hearing officer found that Skvorc was "not a credible witness," having found that Skvorc had been untruthful in his hearing testimony, at his deposition, and in dealing with ADF&G supervisors. The hearing officer also found that the violations were "most serious" and that Skvorc had shown no remorse.

After a public hearing, the personnel board adopted the hearing officer's recommendations, but reduced the fine to $10,000 and eliminated Count XXI. The board recommended Skvorc's termination.

Skvorc appealed to the superior court, raising various claims of procedural error and challenging the legal or factual basis for each violation. The superior court upheld the personnel board's decision on all grounds. Skvorc appeals.

## III. DISCUSSION

### A. Standard of Review

 Several different standards of review apply to this case. We accord no deference to the decision of the superior court because

it acted as an intermediate court of appeal.[2] However, we apply four different standards of review to the administrative decisions.

The "substantial evidence" test is used for questions of fact. The "reasonable basis" test is used for questions of law involving agency expertise. The "substitution of judgment" test is used for questions of law where no expertise is involved. The "reasonable and not arbitrary" test is used for review of administrative regulations.[3]

■■■ Many of the issues presented to this court concern the personnel board's factual findings, which we would normally review under the substantial evidence test.[4] Skvorc argues, however, that we should substitute our judgment and accord no deference to the board's or hearing officer's findings in deciding whether the record supports the factual findings, because, he argues, the hearing officer and board adopted findings proposed by the attorney general rather than drafting their own findings.

We disagree. Alaska Statute 39.52.360(g) authorizes a hearing officer to "direct either or both parties to submit proposed findings of fact, conclusions of law, and recommendation" upon the conclusion of a hearing. This provision implicitly authorizes use of parties' proposed findings in formulating findings and conclusions.

The same is true of the board's findings. After considering the hearing officer's decision and the parties' written and oral arguments, the board accepted most of the hearing officer's findings. There is no indication the board abdicated its responsibility to fully consider the issues before it; the board's reduction of the recommended penalties and rejection of Count XXI suggest otherwise.[5]

■■■ Accordingly, we review the board's findings of fact under the substantial evidence test. Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion."[6]

### B. Adequacy of Notice

The accusation and amended accusation the attorney general filed with the personnel board alleged Ethics Act violations not specified in the complaint ADF&G sent to the attorney general. Skvorc argues that this procedure violated the Ethics Act and his right to procedural due process. According to him, the Act and due process invariably require a mandatory two-stage process in which a complaint served on the employee must allege a particular violation before that alleged violation can be asserted in an accusation.

The first stage, according to Skvorc, requires a complaint, an investigation, and a probable cause finding as to each violation charged. He argues that the complaint gives the employee an opportunity to respond while the Department of Law is still investigating. He reasons that the Department of Law may decide not to proceed to the accusation stage, permitting the investigation and complaint to remain confidential, or possibly permitting a negotiated settlement. He claims that the attorney general's probable cause finding must be made on the basis of the charges alleged in the complaint. If the attorney general's investigation, as here, reveals a basis for new charges, Skvorc would require that any new charges be alleged in a new complaint. This would allow the employee to respond to the new charges, and would require an investigation and a probable cause determination for each new charge.

The second stage begins with the formal accusation and leads to a personnel board hearing.[7] Skvorc argues that this second stage can be taken only after the Department of Law finds probable cause to believe that there has been a knowing violation of

**2.** See Handley v. State, Dep't of Revenue, 838 P.2d 1231, 1233 (Alaska 1992).

**3.** Id. (citing Jager v. State, 537 P.2d 1100, 1107 n. 23 (Alaska 1975)).

**4.** See id.

**5.** Cf. Swanner v. Anchorage Equal Rights Comm'n, 874 P.2d 274, 284–85 (Alaska 1994)

(holding that commission did not abdicate its responsibility by adopting hearing officer's recommendations).

**6.** Handley, 838 P.2d at 1233.

**7.** See AS 39.52.350.

charges set out in a complaint; he thus argues that the state was required to serve him with a complaint containing the additional charges.

The text of the Ethics Act does not invariably require the two-stage process Skvorc advocates. Certainly the investigation and accusation process may begin with a complaint either received or initiated by the attorney general.[8] But that is not the only way the accusation process can begin. If the attorney general determines that "there is probable cause to believe that a knowing violation [of the Act] has occurred," AS 39.52.350(a) provides that the attorney general "shall initiate formal proceedings by serving a copy of an accusation" on the "subject of the accusation."[9] That determination does not necessarily require that there be a prior complaint, much less an amended complaint charging all violations revealed upon investigation.

 In contrast, two other clauses in AS 39.52.350(a) permit accusations in situations that appear to contemplate prior complaints.

One clause permits an accusation if there is probable cause to believe that there is "a violation that cannot be corrected under AS 39.52.330," a statute that refers to the "subject of a complaint."[10] The other clause permits an accusation if "the subject of a complaint" has failed to comply with a recommendation for corrective or preventive action.[11] Even these two clauses do not require that the complaint be amended in the event of later-revealed violations. If they did, the pleading and investigation process would have to begin all over again, at least as to any new charges. The Act does not intimate any such requirement. And because the attorney general must find probable cause before serving the accusation, the accusation process itself requires a preliminary probable cause finding and gives the employee notice of the charges. The Act does not require, or imply, that violations discovered during an investigation must be included in an amended complaint before they can be alleged in an accusation. And the statute specifying the content of complaints does not require amendment.[12]

**8.** *See* AS 39.52.230 (reporting of potential violation to supervisor); AS 39.52.310(a) (permitting attorney general to "initiate" complaint or "elect to treat as a complaint" any matter disclosed in a report or request for advisory opinion).
As of 1995, AS 39.52.230 provided:
A person may report to a public officer's designated supervisor, under oath and in writing, a potential violation of AS 39.52.110—39.52.190 by the public officer. The supervisor shall provide a copy of the report to the officer who is the subject of the report, and shall review the report to determine whether a violation may exist. The supervisor shall act in accordance with AS 39.52.210 or 39.52.220 if the supervisor determines that the matter may result in a violation of AS 39.52.110—39.52.190.
As of 1995, AS 39.52.310 provided in pertinent part:
(a) The attorney general may initiate a complaint, or elect to treat as a complaint any matter disclosed under AS 39.52.210, 39.52.220, 39.52.250, or 39.52.260.
(b) A person may file a complaint with the attorney general regarding the conduct of a current or former public officer. A complaint must be in writing, be signed under oath, and contain a clear statement of the details of the alleged violation.
Those statutes were amended in 1998 in ways not material here. *See* §§ 90, 93–95, ch. 74 SLA 1998.

**9.** AS 39.52.350(a). That section provides in part:

*If the attorney general determines that there is probable cause to believe that a knowing violation of this chapter* or a violation that cannot be corrected under AS 39.52.330 *has occurred,* or that the subject of a complaint failed to comply with a recommendation for corrective or preventive action, *the attorney general shall initiate formal proceedings* by serving a copy of an accusation upon the subject of the accusation.
(Emphasis added.)

**10.** *Id.*

**11.** *Id.*

**12.** AS 39.52.310, the provision of the Ethics Act governing complaints, explicitly discusses the content of complaints filed by individuals but not by the attorney general:

(a) The attorney general may initiate a complaint, or elect to treat as a complaint any matter disclosed under [the disclosure provisions of this Act].
(b) A person may file a complaint with the attorney general regarding the conduct of a current or former public officer. A complaint must be in writing, be signed under oath, and contain a clear statement of the details of the alleged violation.
. . . .
(d) The attorney general shall review each complaint filed, to determine whether it is

The benefits of Skvorc's proposed procedure seem dubious, and are not mandated by the Act or due process. Thus, allowing an employee to respond to the accusation is equivalent to allowing a response to an amended complaint. Requiring an amended complaint does not seem likely to make accusations materially more accurate, and any marginal inaccuracy can be attacked at or before the hearing. Reinvestigating after the accused responds to an amended complaint would be of little utility, given that the attorney general must find probable cause before filing an accusation; that finding likewise minimizes the justification for, or the importance of, confidentiality. And serving the accusation does not preclude the attorney general and the employee from negotiating terms that might avoid a hearing.

We agree with Skvorc that it is important for an employee to have notice of all violations to be heard. Although Skvorc was not told at the complaint stage of all of the charges finally alleged, the July 1995 amended accusation charged all twenty-three counts heard in November 1995. Except possibly with respect to Count XXII, which we discuss below in Part III.D.7, the amended accusation gave Skvorc adequate and timely notice of the charges against him. Skvorc also had an opportunity to respond to the accusation, and therefore had an adequate opportunity to be heard and to contest all the charges, except, possibly, those encompassed by Count XXII. Due process does not require the procedure he proposes.

■ We are unpersuaded by Skvorc's assertion that we should analogize to criminal procedure. The superior court correctly reasoned that "a proceeding under the Ethics Act is more akin to other administrative proceedings than to a criminal proceeding, and therefore, amendment of the accusation should be permitted upon probable cause and in the absence of prejudice."

Skvorc relies on *Linstad v. Sitka School District* [13] as support for his assertion that the accusation cannot go beyond the complaint. But there we simply recognized that the district could not deviate from the original bill of particulars either at the administrative hearing or on appeal.[14] Except as to Count XXII, discussed below, Skvorc is not claiming that the state deviated at the hearing from the charges asserted in the accusation.[15]

### C. Ethics Disclosure

■ Skvorc filed an ethics disclosure form in early May 1993. His supervisor, Jeffery Koenings, drafted a memorandum to Skvorc stating that he recommended disapproval. Koenings did not send the memorandum, but instead recommended that the deputy commissioner file a complaint with the attorney general. The Attorney General's Office notified Skvorc in December 1993 that it had received a complaint in June 1993.

Skvorc asks us to dismiss some charges because ADF&G did not respond to his ethics disclosure.[16] He asserts that the Act required ADF&G to respond to him in writing,[17] and that departmental guidelines required response within twenty working days. Based on employee testimony that the department typically does not respond to ethics disclosures, Skvorc argues that he reason-

properly completed and contains allegations which, if true, would constitute conduct in violation of this chapter.

....

(f) If the attorney general accepts a complaint for investigation, the attorney general shall serve a copy of the complaint upon the subject of the complaint, for a response....

(g) If a complaint is accepted ... the attorney general shall investigate to determine whether a violation of this chapter has occurred.

13. 863 P.2d 838 (Alaska 1993).

14. *See id.* at 840–41.

15. Skvorc also relies on the dissenting opinion in *D.M. v. State, Division of Family and Youth Services*, 995 P.2d 205 (Alaska 2000). That case concerned the state's failure to give a mother pre-hearing notice that it would ask the court to follow a procedure potentially prejudicing her parental rights. But Skvorc does not claim that he had inadequate notice of the procedure governing the hearing or, except for Count XXII, the charges to be heard.

16. This argument concerns Counts I–VII, IX, XI, and XVII of the amended accusation.

17. *See* AS 39.52.210(b).

ably interpreted the department's silence to indicate approval. He claims that its failure to respond was tacit approval that invalidated all charges based on his subsequent actions.

We agree that the department should have responded to Skvorc's disclosure.[18] But silence does not privilege his violations or relieve him of his obligation to comply with the Act.

The Act requires an employee involved in activities potentially barred by the Act to "refrain from taking any official action relating to the matter until a determination is made under this section."[19] Approval is a prerequisite to entering into any otherwise prohibited contract.[20] Silence is not approval.

The statute did not give Skvorc the option of entering into contracts for outside employment without state approval. He was responsible for obtaining approval, and should not have acted without it. ADF&G's failure to respond to Skvorc's disclosure does not justify dismissal of any charges.

### D. *Challenges to the Board's Findings*

#### 1. *Use of official position for personal gain (Counts I–III)*

The board found that Skvorc used his official position for personal gain, committing the acts charged in Counts I–III of the· amended accusation, and violating AS 39.52.120.[21] These counts alleged three events: Skvorc used the information in Patrick Simpson's letter to ADF&G to form a

private business with Simpson; Skvorc converted Winnipeg DFO's request for ADF&G assistance into a private consultancy; and Skvorc converted British Columbia DFO's request for ADF&G assistance into a private consultancy.

 Skvorc does not deny that these events took place. Rather, he argues that there is no proof he took "official action" as the Act defines that term.[22] But the statute prohibiting use of official position for personal gain does not require "official action."[23] It is enough that employees use their "official position" for personal gain or to seek employment. Paragraph 61 of the amended accusation describes the conduct charged in these three counts and repeatedly refers to "official position." The next paragraph is also part of the three counts; although it refers once to "official action," it also correctly cites AS 39.52.120(b)(1). Given the specific averments of the prior paragraph, this drafting discrepancy is not significant. The hearing officer and board concluded that these acts were a misuse of "official position." And in any event, the findings and conclusions would also satisfy the statutory definition of "official action." We affirm with respect to Counts I–III.

#### 2. *Improper use of information (Counts IV–VI)*

 The board found that the activities forming the bases for Counts I–III also constituted instances of improper use of information gained in the course of official duties.[24] The board determined that "the

---

**18.** *See* AS 39.52.210(b): "A public employee's designated supervisor shall make a written determination...."

**19.** AS 39.52.210(a).

**20.** *Cf.* AS 39.52.240(d) (shielding public officers from liability once they receive approval based on full disclosure).

**21.** AS 39.52.120 provides in relevant part:
(a) A public officer may not use, or attempt to use, an official position for personal gain, and may not intentionally secure or grant unwarranted benefits or treatment for any person.
(b) A public officer may not
(1) seek other employment or contracts though the use or attempted use of official position....

**22.** AS 39.52.960(14) defines "official action" as "a recommendation, decision, approval, disapproval, vote, or other similar action, including inaction, by a public officer."

**23.** *See* AS 39.52.120.

**24.** AS 39.52.140(a) provides:
A current or former public officer may not disclose or use information gained in the course of, or by reason of, the officer's official duties that could in any way result in the receipt of any benefit for the officer or an immediate family member, if the information has not also been disseminated to the public.

information Canadian officials and Mr. Simpson were seeking, hydroacoustic assistance, was never disseminated to the public." Skvorc contends that the state offered no evidence satisfying its burden of proving that the information had not been publicly disseminated.

The state showed that Skvorc obtained the information (Simpson's letter and the DFO inquiries) in the course of his official duties and that he then used it to his benefit. Simpson testified that the recipient of his white paper was not allowed to share it and that Skvorc told him after he and Simpson agreed to join forces that he was going to hold on to the document "and make sure it wasn't, you know, circulated." Given the way Simpson and DFO transmitted their information to ADF&G, and Skvorc's intended treatment of Simpson's paper, the board could permissibly infer that the contents of Simpson's paper and the substance of DFO's inquiries were not in fact publicly disseminated. These facts support the board's finding that "[t]he information that Canadian officials and Mr. Simpson were seeking, hydroacoustic assistance, was never disseminated to the public." The board did not err in finding three violations of AS 39.52.140(a).

 The state argues that a regulation narrowly and explicitly defines the phrase "disseminated to the public." [25] Because this regulation did not go into effect until after Skvorc's 1993 actions giving rise to the charges, we cannot rely on it directly in assessing the validity of the charges against him. But we note tangentially that the definition is consistent with the Act's stated statutory purpose [26] and constructional mandate.[27] They seem to reflect a legislative intent consistent with reading the statutory phrase "disseminated to the public" narrowly. The definition is also consistent with prior executive branch interpretation of the dissemination requirement. The state quotes a special assistant to the attorney general who, in testimony during legislative hearings on the proposed Act, explained the Act's purpose in terms of equalizing the ability of public employees and the public to take advantage of information that the state possesses. That testimony supports a restrictive interpretation of "dissemination." We affirm with regard to Counts IV–VI.

### 3. Use of official position for personal gain (Counts VII–IX)

 The board found that Skvorc had improperly solicited and received private compensation for performance of official duties.[28] The board found that Skvorc provided assistance (for compensation) to his private clients and his business that should have been provided as part of his official duties. Thus, Skvorc (1) proffered information assistance for an SFS grant application in expectation of compensation; (2) offered advice to DFO in British Columbia in exchange for travel and lodging and later solicited a contract for additional work; and (3) offered assistance and information to DFO in Winnipeg for monetary compensation.

Skvorc argues that he did not accept, solicit, or receive compensation for these activities. But the Act defines "compensation" as "any money, thing of value, or economic benefit conferred on or received by a person in return for services rendered or to be ren-

---

**25.** 9 Alaska Administrative Code (AAC) 52.070 provides:

> (a) For purposes of AS 39.140, information has been disseminated to the public if it has been published through newspaper publication; broadcast media; a press release; a newsletter; a legal notice; a nonconfidential court filing; a published report; a public speech; or public testimony before the legislature, a board, or a commission.
> (b) Information that is available to the public but that has not been published as described in (a) of this section has not been disseminated to the public.

**26.** See AS 39.52.010.

**27.** AS 39.52.940 provides: "This chapter shall be construed to promote high standards of ethical conduct in state government."

**28.** AS 39.52.120(b)(2) provides that a public officer may not "accept, receive, or solicit compensation for the performance of official duties or responsibilities from a person other than the state."

dered by the person for another." [29] Seeking or receiving expense reimbursement and a contract from DFO satisfied the Act. The Canadian government paid his airfare and lodging. He received compensation because he received "thing[s] of value . . . in return for services rendered. . . ." [30] Skvorc also received over $7,500 (Canadian) for work done on the Arctic Red River.

The record contains evidence showing that Skvorc participated in the grant application expecting a $72,000 annual salary if the grant were awarded, and that he would not be employed by ADF&G when performing his grant work. The statute covers this prospect of future economic benefit. The statute does not require actual or present receipt of money; solicitation of compensation, including prospective or contingent economic benefits, suffices. [31]

Skvorc also claims that he did not misuse his official position because his ADF&G duties did not include traveling to Canada or seeking a grant. But his Canadian work required him to apply state-derived hydroacoustic expertise for someone other than his employer. One of his job duties was to provide advice to the public and other governmental agencies, including foreign governments. It does not matter that he traveled on annual leave. And his grant application relied on information he derived from his state employment. It also resulted from his relationship with Simpson, formed after he learned through his employment of Simpson's solicitation to the state.

Substantial evidence supports the findings of these violations. We affirm as to Counts VII–IX.

29. AS 39.52.960(7).

30. *Id.*

31. *See id.;* AS 39.52.120.

32. The board stated that "[t]his constitutes an attempt to seek employment through the use of state action and is a violation of AS 39.52.120(b)(3)." Subsection (b)(3) states that a public official may not "use state time, property, equipment, or other facilities to benefit personal or financial interests." AS 39.52.120(b)(1) provides that a public officer may not "seek other employment or contracts through the use or attempted use of official position." Count X of the

## 4. *Solicitation of employment while taking official action (Count X)*

The board found that Skvorc sought employment through use of state action when he allowed the SFS grant application to suggest that ADF&G would support the SFS project. [32] The application stated that "we [SFS] will be working closely with ADF&G," and estimated the value of ADF&G's involvement at $360,000.

Because the application also stated that "[i]t is a conflict of interest to request the use of ADF&G facilities until after Skvorc has left," Skvorc argues that the application did not indicate that he had already taken official action to obtain ADF&G approval of the grant.

We disagree. The application insinuated that ADF&G endorsed the project, and mentioned that Skvorc was an ADF&G employee and that SFS, through Skvorc, had been coordinating with ADF&G. This was substantial evidence of a violation. We affirm as to Count X.

## 5. *Incompatible outside service or employment (Counts XI–XVI)*

The board found that Skvorc had committed six violations of AS 39.52.170(a), which prohibits incompatible outside service or employment. [33] The board based the violations on: (1) forming SFS; (2) providing consulting services in Winnipeg in October 1992; (3) providing consulting services in British Columbia in April 1993; (4) purchasing a business license for ART; (5) providing consulting services on the Fraser River in May 1993; and (6) providing consulting ser-

amended accusation cited both AS 39.52.120(b)(1) and (b)(3). The superior court assumed this count concerned subsection (b)(1). Skvorc does not argue that any discrepancy is material, and discusses only subsection (b)(1).

33. AS 39.52.170(a) provides: "A public employee may not render services to benefit a personal or financial interest or engage in or accept employment outside the agency which the employee serves, if the outside employment or service is incompatible or in conflict with the proper discharge of official duties."

vices in Winnipeg in September 1993. Skvorc argues that these activities did not interfere with his official duties. The board found that they conflicted with Skvorc's official duties because (1) he used his state position to facilitate his entry into private business; (2) they were closely related to his responsibilities at ADF&G and were conducted in secret; (3) they took time from his official duties; [34] (4) his private enterprises created conflicts of interest with his official responsibilities; [35] and (5) his work for the Canadian government compromised his loyalty to Alaska during a period of conflict between the two governments. We conclude that substantial evidence supports the board's findings that Skvorc's private activities conflicted with his official duties.

Skvorc contends that the conflict of interest created by consulting for DFO was insignificant or conjectural, and therefore not punishable under the Ethics Act. [36] DFO hired Skvorc as a consultant to count salmon on the Fraser River. Because Alaska and Canada were engaged in a dispute over fisheries management, ADF&G saw this consultancy as a significant conflict. [37] Skvorc argues that any conflict was conjectural because the state failed to demonstrate a direct conflict between his ADF&G responsibilities and his commitments to DFO.

Skvorc provided education and technology which might have been used to count other salmon species more accurately, increasing the credibility of figures Canada might use in its dispute with Alaska. An ADF&G official testified that the United States and Canada were involved in sensitive treaty negotiations and that aiding the Canadians affected a policy issue best decided by higher levels of government. During his deposition, a DFO official in British Columbia testified that Skvorc's help "was much appreciated and very helpful." He was also asked whether Skvorc's help was also useful, apparently in dealing with Native Canadian tribes, in "a certain political sense ... that you had hooked up with experts from Alaska." After objection, he was asked "wasn't that helpful in those ways, also?" He answered: "It was certainly helpful in sending information forward that showed there was, as I would call it, an independent outside party that was providing advice to us on the efficacy of this choice." Substantial evidence supports the board's finding that the consultancy created a conflict.

Skvorc also argues that it is unfair to punish him for purchasing the ART business license while also punishing him for activities stemming from that purchase. Count XIV concerns his license purchase; Counts XV and XVI concern his consultancy work.

The state would justify multiple charges here as notifying employees that they must report outside employment as soon as they enter into any business relationship. It argues that upholding these violations will promote early reporting and prevention of unethical conduct. [38] The state did not seek—and the board did not impose—any penalties for Count XIV, since penalties had been imposed for violations committed pursuant to the licenses.

We think the board utilized an overly broad interpretation of the phrases "render services" and "accept employment." Those terms imply either actual performance of work or an actual agreement to perform

---

**34.** To advance his Canadian consultancy, Skvorc spent work time discussing methods for estimating net selectivity with an employee; he also instructed employees to keep in a state freezer Dolly Varden trout for his grant application.

**35.** HTI, a vendor doing business with ADF&G, competed with ART for the Arctic Red River project. At the time, Skvorc was responsible for evaluating bids for the state in his official capacity.

**36.** AS 39.52.110(b), which describes the scope of the Ethics Act, provides that "[u]nethical conduct is prohibited, but there is no substantial impro-

priety if, as to a specific matter, a public officer's ... action or influence would have insignificant or conjectural effect on the matter."

**37.** The United States and Canada were parties to the Pacific Salmon Commission. In 1992 the Commission was concerned with the disappearance of fish from the Fraser River.

**38.** Cf. Glazer v. Commission on Ethics for Pub. Employees, 431 So.2d 752, 755–56 (La.1983) ("[T]he primary objective of the [Ethics Code] is to prevent public officers and employees from becoming involved in conflicts of interests.").

services. Merely purchasing a business license, without more, would not support a charge under subsection .170(a). The state's rationale of promoting early reporting is unconvincing, because it is not necessary to report non-violations. Failure to disclose unethical activities is punishable; failure to disclose activities that are not actually unethical is not.

▮▮▮ It was error to find that purchasing a business license was a violation. But this error is harmless because the hearing officer recommended that no additional fine be imposed for this count and because it appears the board imposed no individual penalty for this charge. We therefore affirm as to Counts XI–XVI.

### 6. Failure to disclose (Counts XVII–XX)

▮▮▮ The board found four violations of AS 39.52.170(b),[39] which requires disclosure of outside employment: Skvorc's failures to disclose the formation of SFS, his DFO business activities, and his intent in purchasing ART's business license.

Skvorc argues that disclosure was not needed when he purchased the ART business license because it offered only a prospect of future, not current, compensation. But subsection .170(b) does not require current receipt of compensation. It requires disclosure when the employee is "rendering services for compensation, or engaging in employment outside the employee's agency." For reasons discussed above in Part III.D.3, Skvorc's ART activities with DFO met this standard.

We assume for discussion's sake that merely obtaining a business license, without more, cannot be separately charged under subsection .170(b).[40] But Skvorc obtained the license and formed a business with an intention to engage in hydroacoustic-related business activities outside his state employ-

ment. They were preliminary but important steps needed to advance his business purposes. Simply forming a business closely related to his state employment created potential conflicts with his state work.[41] In any event, the hearing officer recommended no additional fine, and the board imposed no separate penalty for his failure to report his intentions when he purchased a business license.

▮▮▮ Skvorc also contends that he fulfilled his duty by submitting his May 3, 1993 disclosure statement. His disclosure form stated:

I hereby officially report my employment or provision of services outside the Department of Fish & Game. These outside duties will in no way affect my usual State duties or duty hours in this Department. This employment or service consists of the following: Consultation services in the field of Fisheries Hydroacoustics, solely outside the State of Alaska and *not* relating to *any* activity associated with Alaskan fisheries issues.

This did not satisfy Skvorc's duty. Because he did not disclose his previous consultation or contracts with DFO, the board did not err in finding that Skvorc failed to fulfill his statutory duty to disclose. We affirm as to Counts XVII–XX.

### 7. Misuse of state time and equipment (Count XXII)

The board found one violation of AS 39.52.120(b)(3), which prohibits misuse of state time, property, and equipment.[42] The board based this violation on twenty-two instances of misuse.

▮▮▮ As Skvorc argues, one of these instances, his use of his ADF&G computer to draft a letter to Canada DFO, is relatively

---

**39.** AS 39.52.170(b) provides in part: "A public employee rendering services for compensation, or engaging in employment outside the employee's agency, shall report. . . ."

**40.** See supra Part III.D.5.

**41.** Skvorc argues similarly regarding the formation of SFS. He claims that he should not be penalized for merely failing to disclose a grant

application, because an Ethics Handbook distributed to ADF&G employees informs employees that they must report a state grant when it is awarded, implying that they need not report it earlier. But the board charged Skvorc with failing to disclose the existence of SFS, not with applying for the grant.

**42.** See supra note 21.

insignificant. Many of the other instances are more serious, and the board reasoned that even if the "insignificant" uses were excluded, the remaining uses "were so extensive" as to warrant maximum penalties. It noted that some, such as the fish kill or exploitation of state employees, would warrant "severe fines and a recommendation of severe discipline." Although we agree with Skvorc, we find this argument inconsequential because it concerns only one of twenty-two acts that form the basis for this charge. These included, most prominently, use of state employees' time and state lockers for killing and storing Dolly Varden trout. These acts provided ample support for this charge. Because the attorney general charged only one count of misuse of state equipment and time, the hearing officer recommended a single, but maximum, fine of $5,000. The board imposed a total fine of $10,000 for all twenty-two remaining counts, having concluded that the cumulative fine recommended by the hearing officer was excessive.

■ Skvorc argues that the complaint's failure to charge most of these acts violates due process and the Act. Although we concluded in Part III.B that it is not necessary to serve an amended complaint charging all counts later charged in the accusation, Count XXII presents a different, and more serious, notice question. No complaint charged these incidents of misuse. The original accusation charged only one incident (using an ADF&G computer to type a letter). When the state served the amended accusation on Skvorc, it also filed a notice stating that the equipment misuse charge "is a continuing charge, and that evidence exists of more than one instance of use of state equipment for personal business pursuits." The amended accusation specified that Skvorc had used the computer and telephones, and also broadly asserted that Skvorc had "used state equipment on other occasions for his private business interests."

We think the amended accusation did not give Skvorc sufficient notice of the specific incidents to be presented to the hearing officer. The record does not reveal whether the state actually gave Skvorc adequate notice of the acts charged through some other means, and whether this procedural deficiency was harmless. We cannot say with assurance that the error was harmless, because the hearing officer considered some of the misuses not charged in the amended accusation to be among the most serious; these uncharged violations may have influenced his penalty recommendation and also may have influenced the board when it imposed penalties and recommended termination. We think remand is necessary, first to determine whether the error was harmless, and if it is not, for reconsideration of the appropriate penalty following dismissal or retrial of Count XXII.

### E. *Reliance on Unpublished Decision*

■ The hearing officer relied on an unpublished personnel board decision, *In re Pearson*, in finding violations and recommending penalties. The state gave Skvorc a copy of the decision and entered it into the record. Skvorc argues that the board, which adopted the hearing officer's findings and conclusions, impermissibly relied on this unpublished decision.

Skvorc has not shown how that reliance harmed him. He has not demonstrated that it caused any improper definition of terms. He does not show that this usage, which is comparable to widely accepted sentencing practices, misguided the legal analysis. He claims that he was disadvantaged by his inability to access unpublished cases favorable to him, but he could have remedied any such prejudice by requesting an opportunity to search. We find no basis for concluding that he was prejudiced.

■ Skvorc also challenges reliance on *Pearson* because the hearing officer disallowed testimony supporting a lighter penalty. Skvorc offered testimony of an ADF&G employee regarding the department's prior treatment of ethical violations. The hearing officer allowed him to testify that ADF&G had overlooked more egregious violations than Skvorc's, but prevented inquiry into specific acts. The hearing officer excluded this testimony because it was not legal precedent. Because purely evidentiary considerations justify exclusion of this testimony, we

see no reason to attribute it to disparate treatment. There is no comparison between this testimony and an unpublished but clearly documented decision.

### F. Assistant Attorney General's Participation

Skvorc argues that an assistant attorney general's participation in the board hearing created a conflict of interest. A member of the Juneau Attorney General's Office recused herself from this case on the ground it would be a conflict of interest for her to advise the board while another member of the Juneau office prosecuted the accusation against Skvorc. Assistant Attorney General Teresa Williams, of the Anchorage Attorney General's Office, then attended the hearing but not the deliberations and gave the board advice on procedural matters. Given that Williams worked in an office different from the one prosecuting Skvorc and that she did not attend the deliberations, we conclude that there was no conflict of interest.

The Alaska Rules of Professional Conduct do not address this issue. But the most closely analogous rule permits an inference that Williams's participation was acceptable. Rule 1.11(c) allows government attorneys to participate in matters from which other members of the same agency are disqualified.[43]

Our precedent weighs against finding a conflict. The parties dispute whether this case is controlled by *Matter of Robson*,[44] or *Stigall v. Anchorage Municipality Police and Fire Retirement Board*.[45] In *Robson* we held that the Alaska Bar Association's executive director could not attend the deliberations of the Bar's disciplinary board while an attorney from her office prosecuted the case.[46] In *Stigall* we held that an administrative agency's legal advisor did not improperly act as an advocate by drafting written interrogatories.[47]

Skvorc's case is more similar to *Stigall*, where an assistant municipal attorney represented the Anchorage Municipality Police and Fire Retirement Board while it heard a former employee's claim for disability benefits.[48] Because the claimant had moved Outside and wished to avoid incurring the expense of attending the rehearing in Alaska, he agreed to answer written interrogatories as a substitute for live testimony.[49] The attorney drafted the interrogatories, a list of questions for cross-examination.[50] The claimant alleged that she had acted both as an advocate adverse to his position and as an advisor to the board.[51] Since she did not participate in the deliberations, we found that there was no conflict.[52] Like her, Williams did not attend the deliberations and played a purely advisory role in the board's determinations. Like the questions for cross-examination drafted by the assistant municipal attorney, the findings drafted by Williams did not taint the decision-making process. Thus, her participation did not create either an actual conflict or the appearance of impropriety.

This conclusion accords with cases elsewhere allowing different members of an attorney general's office to fulfill the dual roles of advisor and prosecutor.[53]

---

43. Alaska Rule of Professional Conduct 1.11(c) provides: "Except as law may otherwise expressly permit, a lawyer serving as a public officer or employee shall not: (1) participate in a matter in which the lawyer participated personally and substantially while in private practice or nongovernmental employment. . . ." The comment to this rule states that "Paragraph (c) does not disqualify other lawyers in the agency with which the lawyer in question has become associated." Alaska R. Prof. Cond. 1.11(c) cmt. (1998).

44. 575 P.2d 771 (Alaska 1978).

45. 718 P.2d 943 (Alaska 1986).

46. *See Matter of Robson*, 575 P.2d at 775.

47. *See Stigall*, 718 P.2d at 946.

48. *See id.* at 945.

49. *See id.*

50. *See id.*

51. *See id.*

52. *See id.* at 946.

53. *See Hladys v. Commonwealth of Virginia*, 235 Va. 145, 366 S.E.2d 98, 99–100 (1988) (holding that having attorney general's office fulfill dual roles of advisor and prosecutor did not violate

### G. *Appropriateness of Penalty*

■ Skvorc contends that the penalties imposed were excessive. The hearing officer recommended fines exceeding $66,000 and termination of Skvorc's employment. Although the board found the fine for each individual count reasonable, it determined that the fines were cumulatively excessive. It reduced the total fine to $10,000, noting that this was approximately twice the amount of remuneration Skvorc received for his conflicting contracts, and recommended termination.

The Ethics Act authorizes civil penalties of up to $5,000 for a violation,[54] fines of up to twice the amount of financial gain realized from any violation,[55] and dismissal.[56] Because the penalties the board assessed bear a financial and mathematical relationship to the amount of profit Skvorc derived from his activities and because they fall well within the range of the penalties authorized by statute, they are reasonable and appropriate.

But because we conclude that Skvorc may have received inadequate notice of some of the acts charged in Count XXII, and because we cannot say that the board's penalty may not have been affected by the findings of some of the violations encompassed in Count XXII, our remand on that issue may require the board to reconsider the penalty.

## IV. *CONCLUSION*

For these reasons, we AFFIRM on all issues, except those relating to Count XXII. As to that count, we REMAND so that the board can consider the notice issue. Unless it finds that Skvorc had adequate actual notice of each on the violations found by the board under Count XXII, it must determine whether the lack of notice was harmless, and if it was not, dismiss or retry those misuse acts not charged in Count XXII of the amended accusation. Depending on the outcome of those issues, the board must reconsider Skvorc's penalty.

BRYNER, Justice, concurring in part and dissenting in part.

I agree with the parts of the court's opinion that affirm violations stemming from Skvorc's involvement in ACT and SFS, but disagree with the parts that affirm violations based on Skvorc's involvement with the Canadian DFO. Concerning the latter violations, I would conclude that they must be reversed because they were never properly charged.

My chief disagreement is with the court's conclusion that the attorney general is entitled to launch formal, public proceedings under AS 39.52.350 without following the preliminary procedures governing complaints set out in AS 39.52.310 and without making a formal determination of probable cause as required under AS 39.52.350(a). I read these provisions to require all Ethics Act charges, including charges initiated by the attorney general, to be commenced by the filing of a complaint and to allow public accusations to be filed only after the subject of the complaint has had an opportunity to respond and after the attorney general has made a formal determination of probable cause.

due process without showing of actual bias); *Washington State Med. Disciplinary Bd. v. Johnston,* 99 Wash.2d 466, 663 P.2d 457, 463–64 (1983) (holding that concentration of investigatory, prosecutory, and adjudicatory functions in attorney general's office does not violate federal due process or state appearance of fairness doctrine). Both cases rely on *Withrow v. Larkin,* 421 U.S. 35, 58, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), where the Supreme Court held that absent a showing of actual bias, it did not violate due process for a single administrative agency to investigate, prosecute, and decide a case.

**54.** AS 39.52.440 provides: " The personnel board may impose on a current or former public officer civil penalties not to exceed $5,000 for a violation of this chapter. A penalty imposed

under this section is in addition to and not instead of any other penalty that may be imposed according to law."

**55.** AS 39.52.450 provides: "The personnel board may, in addition to the civil penalties described in this chapter, require a current or former public officer who has financially benefitted a person in violation of this chapter to pay to the state up to twice the amount that the person realized from the violation."

**56.** AS 39.52.410(a)(3) provides that if the personnel board determines that a public employee has violated the Ethics Act, the board "may recommend that the employee's agency take disciplinary action, including dismissal."

Alaska Statute 39.52.310, the Ethics Act provision governing the filing of complaints, unequivocally applies to actions initiated by the attorney general:

(a) The attorney general may initiate a complaint, or elect to treat as a complaint, any matter disclosed under AS 39.52.210, 39.52.220, 39.52.250, or 39.52.260. . . .

(b) A person may file a complaint with the attorney general regarding the conduct of a current or former public officer. A complaint must be in writing, be signed under oath, and contain a clear statement of the details of the alleged violation.

Under subsection (f) of the same provision, when the attorney general determines that a complaint is worthy of investigation, the subject of the complaint must be given formal notice of the allegations and an opportunity to respond:

If the attorney general accepts a complaint for investigation, the attorney general shall serve a copy of the complaint upon the subject of the complaint, for a response.

Alaska Statute 39.52.340 requires all proceedings relating to the filing and investigation of an Ethics Act complaint to be strictly confidential:

Except as provided in AS 39.52.335, before the initiation of formal proceedings under AS 39.52.350, the complaint and all other documents and information regarding an investigation conducted under this chapter or obtained by the attorney general during the investigation are confidential and not subject to inspection by the public.[1]

Only when an investigation establishes that a complaint filed under AS 39.52.310 is supported by probable cause does AS 39.52.350(a) authorize the attorney general to file a formal charge—an "accusation." And only upon the accusation's filing does the process become public:

If the attorney general determines that there is probable cause to believe that a knowing violation of this chapter or a violation that cannot be corrected under AS 39.52.330 has occurred, or that the subject of a complaint failed to comply with a recommendation for corrective or preventive action, the attorney general shall initiate formal proceedings by serving a copy of an accusation upon the subject of the accusation. The accusation shall specifically set out the alleged violation. After service, the accusation is a public document open to inspection. Except as provided in AS 39.52.370(c), all subsequent proceedings are open to the public.

Not until a proper accusation is filed does the personnel board acquire jurisdiction.[2]

The court today interprets these provisions differently, concluding that they allow the attorney general to institute Ethics Act proceedings without filing a complaint. While acknowledging that "the investigation and accusation process may begin with a complaint either received or initiated by the attorney general,"[3] the court nevertheless holds:

But that is not the only way the accusation process can begin. If the attorney general determines that "there is probable cause to believe that a knowing violation [of the Act] has occurred," AS 39.52.350(a) provides that the attorney general "shall initiate formal proceedings by serving a copy of an accusation" on "the subject of the accusation." That determination does not necessarily require that there be a prior complaint. . . . [4]

In reaching this conclusion, the court mistakenly reads section .350 in isolation, overlooking its relationship to other sections of the Ethics Act and ignoring the legislative history underlying these provisions. The

1. At all times applicable in Skvorc's case, this provision made violation of the confidentiality provision a class A misdemeanor. *See* former AS 39.52.340(a) (1986). Article 4 of the Ethics Act was extensively amended in 1998, and the misdemeanor penalty was then deleted. *See* AS 39.52.340(a), *as amended by* ch. 74, § 98, SLA 1998.

2. *See* AS 39.52.350(c)-(d); AS 39.52.360; AS 39.52.370.

3. Op. at 1198.

4. Op. at 1198–1199 (footnote omitted).

legislative history of Alaska's Ethics Act provides a compelling basis for concluding that its drafters intended the act's provisions governing complaints and accusations to describe a uniform process for prosecuting all Ethics Act violations—a process that prohibits the attorney general from bypassing complaints and that requires formal, pre-accusation determinations of probable cause.

The legislature enacted Alaska's Executive Ethics Act in 1986 as Senate Bill 391; its provisions dealing with complaints and accusations are set out in article 4.[5] The governor's sectional analysis of article 4, forwarded to the legislature on April 2, 1986, makes it clear that the article's provisions are closely related and contemplate an integrated, two-step system for prosecuting Ethics Act violations: "Article 4 ... establishes *a complete process* for handling of complaints regarding violations of the provisions of AS 39.52." [6]

Moreover, the sectional analysis specifies that the state must follow section .310's provisions governing the handling of complaints even when the attorney general is the initiating party: "This section sets out the procedures for handling a complaint, whether filed with the attorney general *or initiated by the attorney general,* and establishes the conditions under which a complaint will be accepted and investigated." [7] Furthermore, the analysis describes only one way of initiating formal proceedings under section .350: the attorney general first makes a determination of probable cause, and then "initiates formal proceedings by serving an accusation upon *the subject of the complaint.*" [8] By referring to the newly accused employee as "the sub-

ject of the complaint," (and by subsequently referring to formally accused employees as "the subject[s] of the accusation" [9]), the sectional analysis unmistakably indicates that section .350's formal accusation process is to be initiated only when section .310's preliminary complaint process has already been used.

In my view, sound public policies support article 4's progressive structure and militate in favor of enforcing its uniform procedural requirements. The court decides otherwise by determining that procedural due process does not require this procedure.[10] But while procedural due process concerns certainly are implicit in section .310's provisions governing complaints and in section .350's provisions governing probable cause and formal accusations, due process is not the only policy that favors strict adherence to article 4's procedural requirements.

By prohibiting public disclosure of Ethics Act proceedings until the first stage of the process is complete, article 4's procedural structure safeguards privacy rights of state employees and protects confidential personnel records from unwarranted disclosure.[11] The statutory structure also encourages voluntary, informal resolution of complaints.[12]

Here, by initiating formal proceedings without filing a complaint and without making a formal determination of probable cause, the state deprived Skvorc of the process prescribed under sections .310 and .350. And by prematurely exposing him to formal public charges, the state also deprived him of his right to confidentiality, virtually dooming any realistic possibility of an informal private

---

5. AS 39.52.310–.370.

6. 1986 Senate Journal at 2213 (emphasis added).

7. *Id.* (emphasis added).

8. *Id.* at 2214 (emphasis added).

9. *Id.*

10. The court reasons that "the amended accusation gave Skvorc adequate and timely notice of the charges against him. Skvorc also had an opportunity to respond to the accusation, and therefore had an adequate opportunity to be heard and to contest all the charges, except,

possibly, those encompassed by Count XXII. Due process does not require the procedure he proposes." Op. at 1199.

11. AS 39.52.340 guarantees confidentiality at the pre-accusation stage of proceedings. A measure of the significance that the act attaches to this guarantee can be seen in the former section .340's provision making breach of confidentiality a class A misdemeanor. *See* former AS 39.52.340(a) (1986).

12. AS 39.52.330 provides the attorney general latitude to recommend informal actions to correct violations when complaints do not warrant formal proceedings.

resolution. Considering the violation of Skvorc's privacy rights, I do not believe that the initial procedural error was cured by the procedural rights that the state subsequently accorded Skvorc; nor do I think that the undeniably strong evidence against Skvorc can justify a finding of harmless error.

Admittedly, the Attorney General's Office served Skvorc with the functional equivalent of a complaint when it sent him its December 13, 1993, letter notifying him of allegations concerning his involvement in a private business—ART—and his participation in soliciting grants through SFS—the partnership that he had established with Patrick Simon.[13] Although the state failed to provide Skvorc with the original letters of complaint that Skvorc's supervisors wrote to the Attorney General's Office, the state's recitation of the substance of the allegations in its December 13 letter substantially complied with the requirements of section .310 with respect to the allegations discussed in the letter. Therefore, to the extent that the formal accusation incorporated the charges earlier described in the complaint—or to the extent that it set out charges that were reasonably foreseeable in light of the information contained in the December 13 letter—the formal accusation should be considered properly filed and procedurally sound.

But the formal accusation did not simply restate or elaborate on the charges set out in the attorney general's December 13 letter of complaint. Rather, it advanced two entirely new factual theories of misconduct, one relating to Skvorc's dealings with the Department of Fisheries and Oceans in Winnipeg; the other relating to his dealings with the British Columbia branch of the DFO. Each of these new factual theories resulted in multiple newly alleged counts of misconduct. Skvorc thus stood accused of engaging in numerous violations that had not been covered in the original complaint, that bore no close connection to the originally alleged misconduct, and that were not reasonably foreseeable based on the facts alleged in the December 13 letter. Since these acts had never before been raised by complaint, I would conclude that they were not properly raised in Skvorc's amended allegation and that they accordingly should have been dismissed.

The court insists that once a complaint has initially been filed, neither the Ethics Act nor due process requires newly discovered violations to be charged in a new or amended complaint:

[B]ecause the attorney general must find probable cause before serving the accusation, the accusation process itself requires a preliminary probable cause finding and gives the employee notice of the charges. The Act does not require, or imply, that violations discovered during an investigation must be included in an amended complaint before they can be alleged in an accusation. And the statute specifying the content of complaints does not require amendment. The benefits of Skvorc's proposed procedure seem dubious, and are not mandated by the Act or due process.[14]

The court's reasoning is flawed in two ways. First, contrary to the court's view that the Ethics Act does not require new violations to be charged in new or amended complaints, the language and legislative history of article 4 reveal that sections .310 and .350 are intended to operate in tandem, requiring all new actions under the Ethics Act to be initiated by a complaint. To the extent that an investigation discloses new violations that fall clearly beyond the scope of an initial complaint, it follows that the act does require the filing of a new or amended complaint.[15]

---

**13.** *See* Op. at 1196.

**14.** Op. at 1198–1199 (footnote & paragraph break omitted).

**15.** Requiring amended complaints would not cause inordinate delay, as suggested in the court's opinion. *See* Op. at 1198. To the extent that the originally charged misconduct is borne out by an investigation that also reveals new misconduct, the original complaint will of course be free to proceed to accusation and a hearing, unaffected by the new misconduct, whose existence can be alleged in the form of a new complaint that will independently make its way through the first step of the complaint process. If, on the other hand, the investigation reveals no probable cause to support the original complaint but a new charge that supplants it, then there is all the more reason to require the initial stage of the proceedings to begin anew.

Second, even if the court is correct in predicting that the accusation process alone sufficiently protects alleged violators' procedural due process rights, the court's focus on due process misses the point at issue.[16] The core concern here is not one of procedural notice or fairness; rather it involves the personnel board's statutory authority.

The legislature has created a new species of ethical offenses that are punishable by substantial penalties; these penalties apply over and above any sanction that can be directly meted out through ordinary personnel actions taken by a state worker's employing agency. Jurisdiction over this new class of misconduct is vested in the personnel board. But the board's authority to act depends upon the existence of a properly filed charge. When the attorney general improperly bypasses the requisite first step of the charging process and directly engages the second by filing an accusation that has not been preceded by a complaint and a formal determination of probable cause, that accusation is not properly before the board, and, lacking authority to hear the new accusations, the board cannot properly find new violations.

Thus, while I agree with the court's disposition of other violations, I would vacate all counts of misconduct reflecting Skvorc's involvement with the Canadian DFO.

16. In declaring that the one-step process used in this case comports with due process, the court overlooks potentially troubling problems. For example, the court assures us that amended complaints are unnecessary because the probable cause requirement protects against unwarranted accusations: "Reinvestigating after the accused responds to an amended complaint would be of little utility, given that the attorney general must find probable cause before filing an accusation[.]" Op. at 1199. But the court's sanguine assumption concerning what the attorney general "must" do before filing an accusation does not necessarily reflect what the attorney general actually does.

Here, neither the accusation nor the amended accusation contains even a pro forma finding of probable cause. Both charging documents begin with the conclusory assertion that they are founded "upon information and belief based on reasonable investigation." Nor is there any sound basis for presuming that the attorney general made a probable cause determination but simply failed to state the determination expressly. Any such presumption is refuted in this case by Count XXII of the amended accusation, which describes two specific incidents of misuse of state

equipment for personal interest, and then summarily charges: "On information and belief, Mr. Skvorc has used state equipment on other occasions for his private business interests." This conclusory assertion of additional unspecified violations based only on "information and belief" obviously was not predicated on a finding of probable cause; indeed, its stated basis virtually alleges the lack of probable cause. Yet at the hearing this allegation grew to encompass twenty-two specific violations—all evidently unearthed sometime after the accusation was filed.

No drafter who had given serious thought and regard to the statutory probable cause requirement would have included the unspecified allegations of Count XXII in the accusation. These accusations raise serious doubts concerning whether a probable cause determination was made as to any part of the amended accusation. Skvorc has not argued that the amended accusation should have been dismissed for lack of a probable cause determination. Accordingly, the point deserves no consideration. But the presence of Count XXII's charging language is nonetheless telling, for it undermines the court's confident assurances that the one-step process it approves today fully suffices to meet our concerns for procedural fairness.